IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 18, 2003

## STATE OF TENNESSEE v. FLOYD PERROW

**Direct Appeal from the Circuit Court for Montgomery County**
**No. 40000431    Michael R. Jones, Judge**

───────────────

**No. M2003-00319-CCA-R3-CD - Filed January 28, 2004**

───────────────

A Montgomery County jury convicted the Defendant, Floyd Perrow, of aggravated burglary, two counts of aggravated rape, and aggravated assault. The trial court merged the two convictions of aggravated rape and sentenced the Defendant to an aggregate thirty-six and a half years in prison. On appeal, the Defendant contends that: (1) insufficient evidence exists in the record to support his convictions; and (2) the trial court imposed an excessive sentence because it should have merged all of the Defendant's convictions into a single conviction. The State also appeals, contending that the trial court erred by merging the two aggravated rape convictions. After thoroughly reviewing the record, we conclude that sufficient evidence exists to support the Defendant's convictions and that the trial court did not err by failing to merge all of the convictions into a single conviction. However, we conclude that the trial court erred by merging the two aggravated rape convictions. Accordingly, we reverse this judgment by the trial court, and we reinstate the two aggravated rape convictions. We remand the case to the trial court for re-sentencing on those two convictions.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Reversed in Part, Affirmed in Part

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JERRY L. SMITH, JJ., joined.

Gregory D. Smith, Clarksville, Tennessee, (on appeal), and Russell Church, Assistant District Public Defender, Clarksville, Tennessee, (at trial and on appeal), for the appellant, Floyd Perrow.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; David H. Findley, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and Arthur Bieber, Assistant District Attorney General, for the appellee, State of Tennessee.

### Opinion
### I. Facts

This case involves the rape and severe beating of L.M.[1] ("victim"), a seventy-nine year old woman, by an intruder who broke into her Clarksville home on the night of May 27, 2000. The Montgomery County Grand Jury indicted the Defendant, Floyd Perrow, for one count of aggravated burglary, one count of aggravated rape by vaginal penetration, one count of aggravated rape by cunnilingus, and one count of attempted first degree murder. A jury convicted the Defendant of aggravated burglary, two counts of aggravated rape, and aggravated assault as a lesser-included offense of attempted first degree murder.[2] The trial court merged the two counts of aggravated rape and imposed an aggregate thirty-six and a half year sentence. The Defendant now appeals.

The following evidence was presented at the Defendant's trial in the Montgomery County Circuit Court. Derek Crow, an officer with the Clarksville Police Department, testified that he was dispatched to 3 Covington Street in Clarksville on the morning of May 28, 2000, to investigate a possible burglary and rape. He stated that, when he arrived at the rear of the house, he noticed that the glass on the screen door had been pushed in and the screen was lying on the back porch. Officer Crow reported that, when he opened the screen door, he discovered that the door to the house was also open and noticed that the bottom of the door frame was covered by freshly cut grass, as if someone with grass on his shoes had kicked the door in. He explained that he believed the intruder gained access into the victim's house by first ripping the screen off of the screen door and then kicking the door in with a grass-covered shoe.

Officer Crow testified that, as he entered the house, he identified himself as a police officer and then heard someone screaming in one of the rooms. The officer stated that, instead of waiting for back-up police officers to arrive, "I went ahead and began clearing the residence to see if anyone was inside and [to] see why the person was still screaming." He reported that, as he entered a hallway toward a bedroom, he saw the victim lying on her back at the front door, and, at first, he thought she was dead because "she was completely covered in blood." The officer explained that, once he approached the victim and identified himself as a police officer, the victim started screaming and moaning for help. He testified that "[s]he didn't really believe at first, . . . that I was a police officer and I reiterated to her that I was a police officer, [that] I was going to help her." Officer Crow reported that the victim had her feet pinned against the front door, "trying to keep anybody from coming through the front door and she was begging me to help her and she just kept saying, 'I need some water, I need some water.'" He stated that the victim was wearing a nightgown that "was completely open exposing her entire body," so he grabbed a blanket off a chair and covered her with it. The officer reported that he then called for an ambulance to assist the victim, and, once the emergency medical technicians arrived, they cut the bloody nightgown off the victim. He explained that, after he called for the ambulance, he finished clearing the house to make sure the intruder was no longer in the house.

---

[1]It is the policy of this Court to use initials of a rape victim rather than the victim's name.

[2]While we recognize that aggravated assault is not a lesser-included offense of attempted first degree murder, State v. Brown, No. M1999-00691-CCA-R3-CD, 2000 WL 262936 (Tenn. Crim. App., at Nashville, Mar. 9, 2000), *perm. app. denied* (Tenn. Sept. 10, 2001), the parties agreed to an amendment to Count Four of the indictment to add the charge of aggravated assault and neither party raises this issue on appeal.

Officer Crow stated that, as he was clearing the house, he noticed that the back bedroom had "large amounts of blood" on the bed and the pillows. The officer stated that he questioned the victim at the crime scene about the identity of her attacker, but the victim could not provide the attacker's name. He explained that "[the victim] . . . referred to [the attacker] as her grass boy, and I didn't understand that. And she said it's the . . . tall slender black man that cuts my grass." Officer Crow testified that, when he asked her how she knew the attacker was her "grass boy," the victim replied "that she could see through the light that was coming through the bedroom window, that it was the man that cuts her grass." The officer explained that the victim told him that her sister would know her "grass boy's" name. He reported that the ambulance took the victim to the hospital about fifteen to thirty minutes after it arrived at the house. Officer Crow stated that he secured the crime scene until the Major Crimes Unit of the Clarksville Police Department arrived.

Virginia Heflin, the victim's sister, testified that she lived "up" the road from the victim in Clarksville at the time the victim was attacked. Heflin stated that, in April or May of 2000, she hired a man to take care of her yard and identified the Defendant as the yard man. Heflin stated that, when the victim injured her shoulder, she recommended that the victim hire the Defendant to work in her yard also. On cross-examination, Heflin explained that the Defendant first worked at the trailer park that she managed, and then she hired him to do odd jobs in her yard. She stated, "I would just get him to do little things, you know, and I would pay him and he would go home." Heflin testified that she did not know how many times the Defendant mowed the victim's yard before the attack.

The victim testified that she was seventy-nine at the time she was attacked in May of 2000. She explained that, on January 31, 2000, she fell on the icy steps at her home and broke her shoulder. The victim stated that, after the fall, she was unable to perform many daily tasks, and that because of this injury, in combination with her existing arthritis, her sister said "that she didn't think I ought to be driving a mower and doing all those things." The victim explained that her sister recommended "[the Defendant] and said that he had mowed her grass and he was mowing other folks' grass everywhere around and work[ing] for people." She identified the Defendant as the man that she hired to mow her grass.

The victim testified that she went to bed at about 10:00 p.m. or 10:30 p.m. on May 27, 2000. She stated that she was sound asleep and then instantly awoke when the back door was "broke open." The victim explained, "It was just a very hard noise and I [knew] the back end of the house was coming down." She stated:

> I wished I had time to have done something, but . . . something happened so fast. . . . I heard the man coming through the hall–fast. And the next thing I knew, he lunged through the door and I [saw] who it was and then he was over me and choking me and had his big hands around my throat and I thought he would never turn me loose . . . .

The victim testified that the Defendant attacked her and lunged at her so fast that she did not have time to react. She stated that she was wearing an old nightgown that buttoned down the front and

her briefs, or "step-ins." The victim explained that, "[a]t the time he was choking me, I could not breathe. Something happened that he turned me [loose]." She stated that the Defendant started stripping her and "when I got my breath back and I started saying, 'why are you doing this?' And he started hitting me, banging me again. He said . . . 'shut up, b***h.'" The victim reported that the Defendant slapped her hard every time she asked, "why are you doing this? Over and over again, the slapping would go on." She explained that the Defendant stripped her nightgown and her briefs off "real fast" and threw them on the floor. She explained that the Defendant "was just grabbing my arms and he was grabbing everywhere–you know, he was just taking over my body with every kind of hand he could." The victim testified that:

> [The Defendant] starting having sex with me, and then he would go in the other way quite a while and then he went down–my body with his mouth and his teeth, I don't know what kind of sex would you call that? Anyway . . . I just don't know why he did that, now, but that's what he did.

She stated that the Defendant penetrated her vagina with his penis and that he performed oral sex on her as well. She stated that the Defendant's mouth and teeth touched her vagina. The victim explained that the Defendant "kept knocking me out so hard . . . I guess I recognized we had gotten on the floor and I wasn't in the position he wanted me, so he kept a knocking–went to beating me on the head then." She stated that she did not know how she got on the floor, "[b]ut he was screaming at me and me screaming back at him to put me back on the bed, the floor was hurting me so bad. 'Will you please put me back on the bed?' He said, 'shut up, b***h, I want you on your belly." She testified that the Defendant told her that he was going to stay all night with her. The victim reported that the Defendant "kept knocking and then beat me and then a little later, I didn't know what [any]body was doing." The victim stated that "I think he was beating me to death, I think he was trying to rape a dead person." She reported that, after the Defendant knocked her unconscious, "I just couldn't hardly guarantee what went on [for] a few hours . . . ." The victim stated that she awoke on the floor and the Defendant was penetrating her vagina again with his penis. She explained that the Defendant then thrust into her "about six hard times, before he got up and he left just as nice as he could down the hall."

The victim testified that:

> I was laying there a long time, listening to see if he was going to come back. I was scared he might come back, if he thought I was even still alive. I thought he left me for dead for sure, so I laid right still a long time and listened and he didn't come back, so–I started to crawl. I couldn't get up on my feet and legs had no use at all in them, why–I don't know? . . . I was taking one elbow that I had use of it, and moved this hip one way and then the other and I was going backwards. So, I got around the foot of my bed in the bedroom and the phone was pulled out, my phone in the bedroom was pulled out. . . . And then I thought, I've got to stay alive until I can get back down the hall now, so I had to get back down the hall to the living room the same way and when I got down there, I couldn't reach up and get the phone, so I got

it by the wire and pulled it down on my stool . . . .

The victim stated that she waited until daylight so she could read the numbers on the phone and then called 9-1-1. She explained that the police officer came to her house a short time after she called the police. The victim testified that she was on the floor by the front door when the officer arrived at her house, and then the ambulance arrived and took her to the hospital.

On cross-examination, the victim stated that she turned out all the lights when she went to bed, "because [there were] plenty of lights shining through my curtains from those businesses out there . . . ." She explained that, due to all of the light coming through her windows from the nearby businesses, "I could get up to the bathroom without even turning a light on in the night." The victim stated that there were two convenience stores located near her bedroom windows. She testified that, while the Defendant had worked in her yard, he had not yet mowed it because mowing was not yet necessary. The victim explained that she told the Defendant when she hired him that "I don't allow anybody in my house that works for me and he didn't say anything." She stated that, after the Defendant worked for her awhile, she allowed the Defendant to use her phone to call his sister, "[b]ut I wish I hadn't because it was against my rules." The victim explained that she thought the Defendant broke into her house at around midnight, though she did not know for certain. She stated that she wears eye glasses all the time, though she does not wear them to bed. She explained that she could cook breakfast without her glasses, but she could not read the newspaper without them. The victim testified that, even without her glasses, she saw a "glimpse of" the Defendant as he came into the room. She stated that she could not remember the Defendant's name on the morning following her attack, but she knew her attacker was the Defendant. The victim explained that she instantly recognized the Defendant when he lunged through the door and attacked her. On re-direct examination, the victim explained that the Defendant broke her eye socket when he beat her on the head.

Dr. William Driver Shippen, Jr., a physician with Clarksville Emergency Physicians at Gateway Medical Center, was declared an expert in the field of emergency medicine by the trial court. Dr. Shippen testified that he examined the victim on May 28, 2000, after she had been physically and sexually assaulted. He stated that the victim told him that "she had been assaulted by someone, [who] had apparently broken into her home and had hit her in the face and the upper part of the body and she had been sexually assaulted by that same person." The doctor reported that the victim stated that her assailant penetrated her vaginally with his penis and later stated that he performed oral sex on her. Dr. Shippen testified that the victim "had marked bruising and swelling to the left side of her head and face and then bruising from the anterior, front part of the neck, and some on the upper front part of the chest and both forearms. . . . The left eye socket was swollen shut." He stated that "X-rays and a cat scan revealed what is called a blow-out fracture of the [eye socket]."

Dr. Shippen testified that he also conducted a sexual assault examination, which revealed that "[t]here were some superficial tears of the soft tissue around the skin and the soft tissue around the outside part of the vaginal opening, and bruises to the inside aspect of both thighs." He stated that

he did not discover any semen during his examination of the victim, though he explained that penetration can occur without the semen being released. Dr. Shippen testified that the victim had bruises on almost seventy-five percent of the left side of her face, which was consistent with injuries inflicted with a closed fist. He stated that the victim also had severe bruising around her neck, "with an apparent darker area of bruising over the larynx, the voice box area," which was consistent with injuries inflicted by choking the neck. The doctor explained that the bruises on the victim's hands and forearms were consistent with "fending off a blow" or being held down by an attacker. Dr. Shippen explained that he believed that most people would become unconscious from the injuries sustained by the victim because "[t]hey would sustain a concussion, the force transmitted to the head and face would render the brain momentarily deprived of blood supply and let the person go unconscious for an indefinite period of time."

Erin William Kellett, a homicide detective with the Clarksville Police Department, testified that he investigated the rape of the victim that occurred during the night of May 27, 2000, and the early morning hours of May 28, 2000. Detective Kellett stated that he talked with the victim's sister, Virginia Helflin, about the name of the man who mowed the victim's grass. He stated that Helflin gave him the Defendant's name and told him that "he lived or stayed up in Long's Mobile Home Park, somewhere around in that area." Detective Kellett testified that he and other officers checked that location but were unable to locate the Defendant. He stated that, at 5:30 p.m. on May 28, 2000, he received a call from his lieutenant, who stated that the Defendant had been picked up and was being taken to the police station. Detective Kellett explained that he went to the police station to interview the Defendant because he suspected that the Defendant was involved in the rape of the victim.

The detective stated that he read the Defendant his <u>Miranda</u> rights and had the Defendant initial the "rights waiver" form at 6:22 p.m. on May 28, 2000. Detective Kellett reported that the Defendant waived his rights and agreed to answer questions. The detective stated that he told the Defendant about the allegations of rape against him and then asked the Defendant for his side of the story. Detective Kellett explained:

> Basically, he stated that he needed a place to stay and that he used to cut grass for [the victim], so he went over there and entered the residence and had sex with her. . . . He stated that he kicked in the back door, went into her room and had sex with the lady.

The detective stated that the Defendant told him that he hit the victim one time and had sex with the victim on the floor. Detective Kellett reported that, when he asked the Defendant whether the victim fought with him, he replied, "Yes, she tried to fight back." The detective stated that the Defendant told him that the victim had underwear on at the time he attacked her but could not remember whether she had on any other clothes. The detective explained that he then asked the Defendant why he picked the victim's house, and the Defendant replied, "because she was an old lady." Detective Kellett stated that he wrote the narrative of his interview with the Defendant at about 7:11 p.m. on May 28, 2000. The detective explained that he allowed the Defendant to read the narrative to make

sure it was an accurate account of what happened. The detective reported that "I had him sign at the end of the statement and then I wrote a statement down there, stating that this statement was written by me, and then he signed it and then he put his initials at the end of each answer that I wrote down." The State then entered the Defendant's statement to police into evidence.

Detective Kellett stated that, after he gave a statement, the Defendant was taken to Gateway Hospital. He reported that the crime scene investigators were unable to raise any latent prints of the Defendant at the victim's home, though they found a shoe print on the door. On cross-examination, Detective Kellett stated that the Clarksville Police Department did not have video cameras set up to record interviews with suspects, so he did not tape the interview with the Defendant, nor did he make an audio recording. The detective stated that the Defendant told him that he was living under a bridge, and police recovered personal belongings from someone under that bridge. Detective Kellett explained that he read the Defendant his rights and asked him if he understood them, and the Defendant told him that he understood. The detective stated that he did not have much experience working with mentally retarded people. He explained that the Defendant "appeared to understand what we were talking about." Detective Kellett stated that, during the interview, he just let the Defendant talk and "then I would interject every now and then." The detective acknowledged that the Defendant signed his name "Floyd Perrow" on one part of the statement and "Perrow Floyd" on another part, and stated that he did not notice the different signatures at the time the Defendant signed the statement. The detective explained that "[s]ome people write their last names first and then their first initials." When asked whether he came to a conclusion about the Defendant's intelligence, Detective Kellett testified that "I don't know what his educational level is. I mean he answered every question that I asked him and I understood what he was saying . . . . I wouldn't say that he was bright . . . ."

Richard Raymond Bertot, Jr., a licensed practical nurse at Gateway Medical Center Emergency Room, testified that he performed a male rape kit on the Defendant on the evening of May 28, 2000. He stated that he asked the Defendant a series of questions on a pre-made form and had the Defendant sign a consent form. Bertot explained that he then drew blood from the Defendant and collected some pubic hair from him. The nurse testified, "The first question I asked him [was], if he knew why he was here? The only thing he said to me [was] 'I guess they say that I raped and beat a woman,' and [he was] not very emotional." Bertot stated that he then asked, "Did fellatio, cunnilingus, or anal penetration allegedly occur? And his answer was 'yes.'" The nurse explained that the Defendant "did not show any emotion, no remorse, no fear, no guilt, no sorrow, no anger, nothing. His answers were very basic." The Defendant did not present any evidence.

## II. Analysis

On appeal, the Defendant contends that: (1) insufficient evidence exists in the record to support his convictions; and (2) the trial court imposed an excessive sentence because it should have merged all of the Defendant's convictions into a single conviction. The State contends that the trial court erred by merging the two aggravated rape convictions.

## A. Sufficiency of the Evidence

The Defendant contends that the evidence presented at trial was insufficient to support all of his convictions. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

The Defendant was convicted of the following offenses: one count of aggravated burglary; two counts of aggravated rape; and one count of aggravated assault as a lesser-included offense of attempted first degree murder. The Defendant contends that the State failed to prove "the required mens rea that [the Defendant] either knew he was making illegal acts or intended to take illegal actions. As such, an essential element of all four convicted crimes, namely intent, is lacking." The Defendant maintains that, due to his low IQ, he did not know he was committing illegal acts. We disagree with the Defendant's assertions.

### 1. Aggravated Burglary

A person commits aggravated burglary who, without the effective consent of the property owner, enters a habitation with the intent to commit a felony, theft or assault or enters a habitation and commits or attempts to commit a felony, theft or assault. Tenn. Code Ann. §§ 39-14-402(a), -403(a) (1997). For the purposes of aggravated burglary, "habitation" means "any structure, including buildings, module units, mobile homes, trailers, and tents, which is designed or adapted for the overnight accommodation of persons." Tenn. Code Ann § 39-14-401(1)(A) (1997). The Code defines "enter" for the purposes of burglary as an "[i]ntrusion of any part of the body [of the property]," Tennessee Code Annotated section 39-14-402(b)(1), or "[i]ntrusion of any object in physical contact with the body or any object controlled by remote control, electronic or otherwise."

Tenn. Code Ann. § 39-14-402(b)(2).

In this case, the Defendant made the following statement to police: "I was walking around last night. I needed a place to stay. I went to Virginia's sister's house. I worked for her cutting grass. I kicked in the back door and went into her bedroom and had sex with the lady." The Defendant stated that while he was having sex with the victim, the victim "tried to fight back." The Defendant further explained to police that he picked the victim's house "[b]ecause she was an old lady." The victim testified that she awoke when she heard her back door being kicked in on the evening of May 27, 2000. She stated that she immediately recognized the Defendant when he lunged into her bedroom and started to beat and rape her. The victim testified that the Defendant performed cunnilingus on her and then penetrated her vagina with his penis. She further testified that the Defendant broke her eye socket during the course of the beatings. This evidence clearly shows that the Defendant entered the victim's residence and proceeded to beat and rape the victim repeatedly. The Defendant presented no evidence of his intelligence, or lack thereof, or how his intelligence level affected his mental culpability to commit aggravated burglary. The Defendant showed by his actions on the night of the attack and by his confession to police that he intended to commit burglary by unlawfully entering the victim's residence and repeatedly raping and beating the victim. Accordingly, we conclude that a rational trier of fact could have found the essential elements of aggravated burglary beyond a reasonable doubt.

## 2. Aggravated Rape

Tennessee Code Annotated section 39-13-502(a) (1997) defines aggravated rape as: "[U]nlawful sexual penetration of a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances: . . . (2) The defendant causes bodily injury to the victim. . . ." Tennessee Code Annotated section 39-13-501(7) (1997) states that "'[s]exual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required . . . ." Cunnilingus, "a sexual activity involving oral contact with the female genitals," does not require that the mouth or tongue actually penetrate into the vagina. See State v. Hoyt, 928 S.W.2d 935, 942 (Tenn. 1995) (quoting State v. Vanderbilt, No. 70, 1992 WL 69650, at *2 (Tenn. Crim. App., at Jackson, April 8, 1992), perm. app. denied (Tenn. 1992)), *overruled on other grounds by* Spicer v. State, 12 S.W.3d 48 (Tenn. 2000); State v. Crabtree, No. E2001-02374-CCA-R3-CD, 2003 WL 240015, at*4 (Tenn. Crim. App., at Knoxville, Jan. 31, 2003), *perm. app. denied* (Tenn. June 30, 2003).

In this case, the jury convicted the Defendant of one count of aggravated rape for penetrating the victim's vagina with his penis and one count of aggravated rape for performing cunnilingus, or oral sex, on the victim. The victim testified that the Defendant "starting having sex with me, and then he would go in the other way quite a while and then he went down–my body with his mouth and his teeth. . . ." She stated that the Defendant penetrated her vagina with his penis and that he performed oral sex on her as well. She testified that the Defendant's mouth and teeth touched her

vagina. The Defendant admitted to police that he "had sex with the lady" and that he had sex with the victim "[o]n the floor." When asked whether the victim fought with him, the Defendant replied, "Yes, she tried to fight back." When asked by a nurse whether "fellatio, cunnilingus, or anal penetration allegedly occur[red]," the Defendant answered, "yes." This evidence is clearly sufficient to show that the Defendant sexually penetrated the victim with his penis and his mouth.

The evidence also showed that the victim suffered bodily injury. Dr. Shippen testified that the victim "had marked bruising and swelling to the left side of her head and face and then bruising from the anterior, front part of the neck, and some on the upper front part of the chest and both forearms. . . . The left eye socket was swollen shut." He stated that "X-rays and a cat scan revealed what is called a blow-out fracture of the [eye socket]." Dr. Shippen testified that he also conducted a sexual assault examination, which revealed that "[t]here were some superficial tears of the soft tissue around the skin and the soft tissue around the outside part of the vaginal opening, and bruises to the inside aspect of both thighs." The evidence clearly shows that the Defendant penetrated the victim's vagina by performing cunnilingus and by having sexual intercourse with the victim, and that the victim suffered serious bodily injury. Accordingly, we conclude that a rational trier of fact could have found the Defendant guilty on both counts of aggravated rape beyond a reasonable doubt.

### 3. Aggravated Assault

A person commits aggravated assault if he or she "[i]ntentionally or knowingly commits an assault as defined in § 39-13-101 and: (A) Causes serious bodily injury to another; or (B) Uses or displays a deadly weapon." Tenn. Code Ann. § 39-13-102(a) (1997). Tennessee Code Annotated section 39-13-101(a) (1997) states that a person commits assault if he or she: "(1) Intentionally, knowingly or recklessly causes bodily injury to another; (2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury; or (3) Intentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative."

In this case, the jury convicted the Defendant of one count of aggravated assault as a lesser-included offense of attempted first degree murder. The victim testified that the Defendant choked her neck and repeatedly beat her head and body with his hands, causing her to go unconscious. The victim stated that the Defendant started stripping her and "when I got my breath back and I started saying, 'why are you doing this?' And he started hitting me, banging me again. He said . . . 'shut up, b***h.'" The victim reported that the Defendant slapped her hard every time she asked, "why are you doing this? Over and over again, the slapping would go on." Dr. Shippen testified that the victim had severe bruising on her face, neck, upper chest, and forearms and a fractured eye socket as a result of the beating. The Defendant admitted to police that the victim fought with him and that he hit the victim one time. This evidence is sufficient to support the jury's finding that the Defendant intentionally or knowingly beat the victim, causing serious bodily injury to the victim. Accordingly, we conclude that a rational trier of fact could have found the essential elements of aggravated assault beyond a reasonable doubt.

## B. **State v. Anthony Issue**

The Defendant contends that the sentence imposed by the trial court was excessive[3] because the trial court failed to merge the Defendant's convictions for aggravated burglary, aggravated rape and aggravated assault pursuant to State v. Anthony, 817 S.W.2d 299 (Tenn. 1991). The Defendant contends that "[t]he actions in this case all appear to relate to a common scheme or plan. If this Court finds [the Defendant] was mentally competent to form the intent to commit burglary, rape and/or murder, then the actions should merge as a single crime according to State v. Anthony." We disagree with the Defendant's argument.

In Anthony, the Tennessee Supreme Court held that a separate kidnapping conviction may violate due process when "the confinement, movement, or detention is essentially incidental to the accompanying felony" and not "significant enough, in and of itself, to warrant independent prosecution . . . ." Anthony, 817 S.W.2d at 306; see State v. Cozart, 54 S.W.3d 242, 244-45 (Tenn. 2001). The Anthony court vacated the aggravated kidnapping convictions because it found that they were essentially incidental to the other felony offense for which the defendants had been convicted, armed robbery. Anthony, 817 S.W.2d at 307. However, the Tennessee Supreme Court has never extended the analysis adopted in Anthony beyond the kidnapping context. State v. Ralph, 6 S.W.3d 251, 256-57 (Tenn. 1999) (holding due process was not violated by dual convictions for burglary and theft); see State v. Barney, 986 S.W.2d 545, 548 (Tenn. 1999) (holding that the "essentially incidental" test developed in Anthony "is not helpful in the context of sexual offenses"); State v. Dixon, 957 S.W.2d 532 (Tenn. 1997) (applying the Anthony analysis and upholding a separate conviction for aggravated kidnapping for detention that occurred during the course of an aggravated assault and attempted sexual battery); State v. Coleman, 865 S.W.2d 455, 457 (Tenn. 1993) (applying the test enunciated in Anthony and vacating a kidnapping conviction because the abduction was essentially incidental to the robbery). In State v. Waters, No. M2001-02682-CCA-R3-CD, 2003 WL 213777, at *14 (Tenn. Crim. App., at Nashville, Jan. 30, 2003), *perm. app. denied* (Tenn. June 2, 2003), this Court declined to extend Anthony to include separate convictions for aggravated rape, aggravated robbery, and aggravated burglary. Likewise, we decline to extend Anthony to include separate convictions for aggravated burglary, aggravated rape, and aggravated assault.

Each of these offenses contains different elements as defined by statute. Aggravated burglary is the unlawful entry into a habitation with the intent to commit a felony, theft or assault or accompanied by the actual commission or attempt to commit a felony, theft or assault. Tenn. Code Ann. §§ 39-14-402(a), -403(a). Aggravated rape is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim accomplished by force or coercion and a weapon or accompanied by bodily injury to the victim. Tenn. Code Ann. § 39-13-502(a)(1), (2). Aggravated assault is the intentional or knowing assault on a person using or displaying a deadly weapon or causing serious bodily injury. Tenn. Code Ann. § 39-13-102(a)(1)(A), (B). Each of these offenses

---

[3]In his appellate brief, the Defendant failed to argue any sentencing issues other than the Anthony issue. Accordingly, we conclude that the Defendant has waived any other sentencing issues. Tenn. R. App. P. 13(b); Tenn. R. Ct. Crim. App. 10(b).

may be committed without committing the others. Therefore, we conclude that the Defendant's separate convictions for aggravated burglary, aggravated rape, and aggravated assault do not violate due process.

### C. Merger of the Aggravated Rape Convictions

Finally, the State contends that the trial court erred in merging the Defendant's convictions for aggravated rape by cunnilingus and aggravated rape by penile penetration into one aggravated rape conviction under State v. Phillips, 924 S.W.2d 662 (Tenn. 1996). The trial court merged the two aggravated rape convictions because it found that "[t]his was one continuous act." We agree with the State's assertion.

The State's argument that the trial court erred in merging the Defendant's aggravated rape convictions requires double jeopardy analysis. The double jeopardy clause of the Fifth Amendment to the United States Constitution affords a defendant three basic protections: "(1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense." Phillips, 924 S.W.2d at 664 (citing North Carolina v. Pearce, 395 U.S. 711, 717 (1969)); see State v. Beauregard, 32 S.W.3d 681, 682 (Tenn. 2000). The present issue concerns the third category of protections.

Multiplicity involves the division of conduct into discrete offenses, creating several offenses out of a single offense. Phillips, 924 S.W.2d at 664. In Phillips, the Tennessee Supreme Court explained that, in determining whether offenses are "stacked" so as to be multiplicitous, the following principles should be considered:

> 1. A single offense may not be divided into separate parts; generally, a single wrongful act may not furnish the basis for more than one criminal prosecution;
> 2. If each offense charged requires proof of a fact not required in proving the other, the offenses are not multiplicitous; and
> 3. Where time and location separate and distinguish the commission of the offenses, the offenses cannot be said to have arisen out of a single wrongful act.

Id. at 665 (citations omitted). The Phillips court noted that the following factors are also significant in determining whether sexual offenses are multiplicitous:

> 1. The nature of the act;
> 2. The area of the victim's body invaded by the sexually assaultive behavior;
> 3. The time elapsed between the discrete conduct;
> 4. The accused's intent, in the sense that the lapse of time may indicate a newly formed intent to again seek sexual gratification or inflict abuse; and
> 5. The cumulative punishment.

Id.  The Phillips court observed "that the presence and absence of any one factor or a combination of them other than the nature of the act is not determinative of the issue."  Id.

The Tennessee Supreme Court noted that "although separate acts of intercourse may be so related as to constitute one criminal offense, generally rape is not a continuous offense, but each act of intercourse constitutes a distinct and separate offense."  Id. at 664.  Tennessee Code Annotated section 39-13-501(7) states that "'[s]exual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required. . . ."  These discrete types of sexual penetration are subsumed by Tennessee Code Annotated section 39-13-502, the aggravated rape statute.  The Phillips court noted that "[e]ach act, in our opinion, is capable of producing its own attendant fear, humiliation, pain, and damage to the victim.  Each type of penetration requires a purposeful act on the part of the perpetrator."  Phillips, 924 S.W.2d at 665.

In Phillips, the Tennessee Supreme Court upheld convictions for aggravated rape for three separate acts of sexual penetration: the defendant inserted a plastic object into the victim's vagina; he performed cunnilingus; and he forced her to engage in vaginal intercourse.  Id. at 663-64.  The Phillips court found that the defendant committed three separate offenses because each of the sexual acts, which expended approximately three hours, required a different body position and engaged different body parts.  Id. at 665.  In State v. Kendrick, 38 S.W.3d 566, 569 (Tenn. 2001), the Tennessee Supreme Court applied the Phillips factors and concluded that the defendant committed two separate and distinct offenses after the proof showed that the defendant forced the victim to perform fellatio on him and then forced the victim to have vaginal intercourse.  In Barney, 986 S.W.2d at 549-50, the Tennessee Supreme Court applied the Phillips factors in determining whether the acts of aggravated sexual battery and rape of a child were discrete acts that justified separate convictions.  The Barney court found that "the acts, although close in time, were not performed simultaneously."  Id. at 550.  Further, the court concluded that each act was "capable of producing its own attendant fear, humiliation, pain, and damage to the victim," and "each act required a different body position and engaged different body parts, evidencing a separate intent on the part of the defendant."  Id.

In State v. Medlock, No. W2000-03009-CCA-R3-CD, 2002 WL 1549707, at *4 (Tenn. Crim. App., at Jackson, Jan. 16, 2002), *perm. app. denied* (Tenn. July 1, 2002), this Court found that the evidence established two separate acts of vaginal penetration, one with a coat hanger and one penile.  The court reasoned that each act was of a different nature and occurred "more than a few minutes apart" in different rooms of the house.  Id.  Likewise, in Waters, 2003 WL 213777, at *12, this Court concluded that defendant's conduct constituted two separate and distinct offenses of aggravated rape after the evidence showed that the defendant forced the victim to perform fellatio on him twice, five minutes apart.  The court found that, "[u]nder the circumstances, each act of forced fellatio was capable of producing its own 'fear, humiliation, pain, and damage to the victim.'"  Id. (quoting Barney, 986 S.W.2d at 550).

-13-

However, in State v. Arnett, No. 03C01-98110-CR-00395, 2000 WL 122222, at *7 (Tenn. Crim. App., at Knoxville, Feb. 2, 2000), *aff'd*, 49 S.W.3d 250 (Tenn. 2001), this Court merged the defendant's two convictions for aggravated rape, holding that the separate convictions violated double jeopardy principles. The court explained:

> Clearly, the penetrations invaded the same body area of the victim, with only seconds elapsing between the two penetrations. Obviously, from the victim's testimony, the digital penetration was merely the means of completing the penile penetration. We are unable to conclude that the intervening seconds between the penetrations provided a sufficient lapse of time so as to permit the development of "a newly formed intent" as the digital penetration only served to facilitate the penile penetration.

Id. (citing Phillips, 924 S.W.2d at 665).

In the case under submission, the victim testified that the Defendant penetrated her vagina with his penis and that he performed oral sex on her as well. She stated that the Defendant's mouth and teeth touched her vagina. The victim explained that the Defendant kept "beating me on the head" because "I wasn't in the position he wanted me." The victim did not testify about the lapse of time in between each sexual act, though she stated that the entire episode lasted all night long. She stated that the Defendant knocked her unconscious, and then, when she "came to," the Defendant was having vaginal intercourse with her again. She stated that, when the Defendant finally finished raping her, "it didn't [seem] very long until daylight and . . . I think that was right after 5:00 [a.m.]" The Defendant admitted to police that he "had sex with the lady" and that he had sex with the victim "[o]n the floor." When asked whether the victim fought with him, the Defendant replied, "Yes, she tried to fight back." When asked by a nurse whether "fellatio, cunnilingus, or anal penetration allegedly occur[red]," the Defendant answered, "yes."

We disagree with the trial court that this was "one continuous act" and conclude that the Defendant's conduct constituted two separate and distinct offenses of aggravated rape. The proof shows that the Defendant performed cunnilingus on the victim and, as a separate and distinct act, penetrated her vagina with his penis. Indeed, the Defendant's act of performing oral sex on the victim required him to be in a different body position and engage different body parts than his act of vaginal intercourse with the victim, which evidences a separate intent on the part of the Defendant. Phillips, 924 S.W.2d at 665. Moreover, each separate act of cunnilingus and vaginal intercourse required a purposeful act by the Defendant. Id. Though the duration of the attack is not entirely clear, the victim stated that it lasted all night long, at least until 5:00 a.m. We also conclude that each act by the Defendant produced "its own attendant fear, humiliation, pain, and damage to the victim." Id. Therefore, we conclude that the trial court erred by merging the Defendant's two aggravated rape convictions. Accordingly, we reverse the trial court's judgment merging the two aggravated rape convictions and reinstate both convictions. We remand the case to the trial court for re-sentencing on the two convictions of aggravated rape.

### III. Conclusion

In accordance with the foregoing authorities and reasoning, we REVERSE the trial court's judgment merging the two aggravated rape convictions and REINSTATE both convictions. We REMAND the case to the trial court for re-sentencing on the two convictions of aggravated rape. We AFFIRM the judgments of the trial court in all other respects.

_____
ROBERT W. WEDEMEYER, JUDGE